JUDGE DANIELS

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

**'07 CIV 4779**

Docket #

|   |   |
|---|---|
| IN RE JUDGMENT OF COMMERCIAL COURT, LONDON, DATED OCTOBER 23, 2006 | : |
| | : |
| | : |
| | : |
| Relates to: | : |
| ROBERT W. MANN, AS TRUSTEE FOR ROBERT W. MANN RETIREMENT TRUST, LOTUSBAY, LLC, | : |
| LIAN MEI DEVELOPMENT, LLC, | : |
| Judgment Creditors | : |
| | : |
| V. | : |
| | : |
| MICHAEL ROBERT ALEXANDER BROWN, FIFTH AVENUE PARTNERS LTD., DEVONSHIRE CAPITAL LTD., LAMBERHURST DEVELOPMENTS LTD., FIFTH AVENUE PARTNERS GMBH | : |
| Judgment Debtors | : |
| | : |

COMPLAINT IN AN
ACTION
TO
ENFORCE
JUDGMENT



RECEIVED
JUN 0 5 2007
U.S.D.C. S.D. N.Y.
CASHIERS

Judgment creditors, by their attorneys, Rawle & Henderson LLP, hereby allege,

upon personal knowledge as to themselves and their own acts, and upon information and

belief as to all other matters, as follows:

## I.    NATURE OF THE ACTION

1.    Judgment creditors Robert W. Mann, as trustee for the Robert W. Mann

Retirement Trust, Lotusbay LLC and Lian Mei Development LLC, also referred to

collectively herein as the "JUDGMENT CREDITORS", bring this action in aid of

enforcement of the Judgment entered by the Commercial Court, Queens Bench Division,

Royal Courts, in London, Great Britain.  Said Judgment was entered on or about October

23, 2006, against Michael Robert Alexander Brown, Fifth Avenue Partners Ltd.,

Devonshire Capital Ltd., Lamberhurst Properties Ltd., and Fifth Avenue Partners GmbH,

also referred to collectively herein as the "JUDGMENT DEBTORS".

   2.  A copy of the certified Order for Judgment to Be Entered by the

Commercial Court, Queens Bench Division, Royal Courts, in London, Great Britain, with

the Apostille Certification pursuant to the 1961 Hague Convention Abolishing the

Requirement of Legalization for Foreign Public Documents, is attached hereto as Exhibit

"A"

## II. PARTIES

   3.  Judgment creditor Robert W. Mann, as trustee of Robert W. Mann

Retirement Trust (hereinafter "MANN"), is a citizen of California, residing in Los

Angeles and elsewhere in California, and is referred to herein as one of the JUDGMENT

CREDITORS.

   4.  Judgment creditor Lotusbay LLC (hereinafter "LOTUSBAY") is a

Limited Liability Company, organized under the laws of the State of Delaware, with the

registered office at: 2711 Centerville Rd., Suite 400, Wilmington, DE, 19308.

LOTUSBAY is the assignee of the judgment debt, whose original holder was Yan Lucy

Lu ("LU"), a citizen of Canada.  LOTUSBAY is referred to herein as one of the

JUDGMENT CREDITORS.

   5.  Judgment creditor Lian Mei Development LLC (hereinafter "LIAN") is a

Limited Liability Company, organized under the laws of the State of Delaware, with the

registered office at: 2711 Centerville Rd., Suite 400, Wilmington, DE, 19308.  LIAN is

the assignee of the judgment debt, whose original holder was Kevin So ("SO"), a citizen

of People's Republic of China.  LIAN is referred to herein as one of the JUDGMENT CREDITORS.

     6.    Judgment debtor Michael Robert Alexander Brown (hereinafter "BROWN") is, and was, at all relevant times hereto, a citizen of the United Kingdom and resident of Spain and/or Switzerland.  BROWN has conducted business internationally, including in New York and has, upon information and belief, assets located in New York, in particular upon fraudulent transfers.  BROWN's latest known usual place of abode, before his latest arrest in about April of 2006, was at: Avenue Rotgetes 9, Esporles, Mallorca, 07190, Spain.  BROWN's current usual place of adobe is, on information and belief, a correctional institution under the auspices of the Home Office and Ministry of Justice of the U.K. or possibly on supervised bail.

     7.    Judgment debtor Fifth Avenue Partners Ltd., aka 5th Avenue Partners Ltd. (hereinafter "FIFTH AVENUE") is, and was, at all relevant times hereto, a company organized under the laws of England and Wales, with offices at: Calle Conquistador 18, Planta Primero, Palma de Mallorca, 07001, Spain, as well as at: 26 Upper Book Street, London, 1WK 7QE, and/or 10 Dominion Street, London, EC2M 2EE, U.K., and other locations.  FIFTH AVENUE has been conducting business internationally, including its having conducted business in New York, and, upon information and belief, having assets located in New York, involving fraudulent transfers.

     8.    Judgment debtor Devonshire Capital Ltd., (hereinafter "DEVONSHIRE") is, and was, at all relevant times hereto, a company organized under the laws of Gibraltar, with a nominee registered office at: 1 Corral Rd., Gibraltar, with de facto offices at: Calle Conquistador 18, Planta Primero, Palma de Mallorca, 07001, Spain, as well as at: 26

Upper Book Street, London, 1WK 7QE, and/or 10 Dominion Street, London, EC2M 2EE, U.K., and at other locations. DEVONSHIRE has been conducting business internationally including its having conducted business in New York, and, upon information and belief, having assets located in New York, involving fraudulent transfers.

9.     Judgment debtor Lamberhurst Properties Ltd. (hereinafter "LAMBERHURST") is, and was, at all relevant times hereto, a company organized under the laws of England and Wales, with offices at: Calle Conquistador 18, Planta Primero, Palma de Mallorca, 07001, Spain, as well as at: 10 Dominion Street, London, EC2M 2EE, U.K. LAMBERHURST has been conducting business internationally, including its having conducted business in New York, and, upon information and belief, having assets located in New York, involving fraudulent transfers.

10.    Judgment debtor Fifth Avenue Partners GmbH aka 5th Avenue Partners GmbH (hereinafter "FIFTH GMBH") is, and was, at all relevant times hereto, a company organized under the laws of Switzerland, with offices at: Alpenstrasse 11, Zug, Switzerland, and at: Calle Conquistador 18, Planta Primero, Palma de Mallorca, 07001, Spain. FIFTH GMBH has been conducting business internationally, including its having conducted business in New York, and, upon information and belief, having assets located in New York, involving fraudulent transfers.

11.    At all times material hereto, each of the JUDGMENT DEBTORS was the agent, servant, partner, and/or employee of each of the other defendants and was acting within the scope of his, her, or its agency or employment and acting also with the full knowledge or subsequent ratification of his, her, or its partners, principals, or employers.

### III.    JURISDICTION AND VENUE

12.    This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §1332, in that the JUDGMENT CREDITORS and the JUDGMENT DEBTORS are citizens of different states and/or countries and the amount of controversy, exclusive of interest and costs, exceeds the sum of $75,000

13.    Venue is proper, pursuant to 28 U.S.C. §1391 (a), in that a substantial part of the events or omissions giving rise to the claims on the judgment debt occurred, or substantial part of property that is the subject of the action is situated within, this district. Venue is also proper, pursuant to 28 U.S.C. §1391 (d), in that the JUDGMENT DEBTORS are citizens of foreign countries.

14.    This Court has additionally jurisdiction over the subject matter of this action pursuant to the Uniform Fraudulent Conveyance Act of the State of New York, N.Y. Debt. & Cred. Law art. 10 [§ 270 *et seq.*] because the assets of the JUDGMENT DEBTORS have been either located on or, passed through, the accounts of the banking and financial institutions in New York, involving fraudulent transfers/conveyances.

15.    This Court has additional jurisdiction for purposes of aid to enforcement of the foreign judgment, the banking and financial institutions located in New York have either the custody of the assets for the satisfaction of the judgment debt and/or have under their control the evidence on the current location of said assets for satisfaction of said judgment debt.  Furthermore, this Court has jurisdiction because the necessary discovery in aid of the judgment enforcement is due from the financial institutions located in New York, particularly in the Southern District of New York.

16.     This Court has jurisdiction because the trades of bonds at issue occurred, among other commercial papers, with the American MTNs and/or bonds, generally known as Fannie Mae, Freddie Mac, Ginnie Mae, and others, issued by the various American governmental, public, and private institutions and organizations in New York and elsewhere, and regularly traded on the financial market in New York.

### IV.    UNDERLYING FACTS

17.     It should be noted that BROWN, 5th Avenue Partners Ltd, 5th Avenue GmbH, and the Brown BANK, HSBC, have acted in what can be called a "cabal," and any reference herein to Brown is intended as a reference to the "cabal-type relationship" with HSBC, whether expressly stated or not.

Nothing herein is intended to be a waiver by the JUDGMENT CREDITORS of their rights against HSBC .

18.     At the times relevant hereto, the JUDGMENT CREDITORS sought on the financial market investment opportunities, namely safe investments into Medium-Term Notes (also known as "MTN"s or "bonds") of governmental, public, and private institutions in various jurisdictions, including in the U.S. The investment objective of the JUDGMENT CREDITORS was to generate profits by purchasing for investment purposes and thereupon selling bonds solely issued by financial institutions with a very high credit rating -- A+ or better.

19.     BROWN, an international bond trader with a British passport and a permanent resident status in the U.S., residing at certain times before in the State of Florida and in New York State, having his contemporaneous corporate offices in Spain, Switzerland, and the U.K., was recommended to each of the JUDGMENT CREDITORS

by HSBC and others to further their investment objectives. What appears to be the trade name FIFTH AVENUE, that BROWN used for his entities incorporated in several jurisdictions as "5th Avenue," was, on information and belief, used by BROWN to create the impression of being related to an avenue in the Borough of Manhattan, New York, under that same name, and to imply before third parties his close association with the financial market in New York.

20.     At all times, BROWN, HSBC and others, however, concealed before the JUDGMENT CREDITORS that there was, in fact, an outstanding warrant for BROWN's arrest in the State of Florida, after BROWN avoided appearing before the Court in Florida for writing worthless checks.

21.     BROWN acted through the FIFTH AVENUE accounts at his bank, HSBC Bank PLC in London (hereinafter "HSBC"), a part of the international banking group Hong Kong and Shanghai Banking Corporation, which accounts he maintained and/or controlled in an *ad hoc* association and alleged conspiracy with HSBC.

22.     BROWN, as well as HSBC, promised the JUDGMENT CREDITORS and/or their representatives, orally and in writing, that he, Brown, as well as HSBC would direct the agreed-upon investments in the MTN/bond financial markets. BROWN and HSBC pledged, that they would oversee and protect the investments of the JUDGMENT CREDITORS.

23.     As a part of promoting his services, BROWN gave to the JUDGMENT CREDITORS and/or their representatives private access to the web-site requiring a password, promoting his services only to his clients or potential clients, world-wide, including in the United States. The promotional materials on FIFTH AVENUE website

indicated, inter *alia*, that FIFTH AVENUE traded in U.S.-originated bonds, such as

Fannie Mae, Freddie Mac, notes based on the American mortgage underwriting pools,

and various other MTNs/bonds and commercial papers on the U.S. financial market. The

website implied that FIFTH AVENUE complied with the U.S. regulations.

     24.    As a part of the investment terms, established in an express written form,

BROWN and/or HSBC, were not allowed, under any circumstances, to move the

JUDGMENT CREDITORS' funds from the FIFTH AVENUE account(s) at HSBC.

     25.    However, instead of the promised operations and instead of safeguarding

the funds that BROWN and HSBC had received from the JUDGMENT CREDITORS on

the FIFTH AVENUE account(s) at HSBC, BROWN and HSBC fraudulently and

deceitfully misappropriated the investment funds of the JUDGMENT CREDITORS for

unauthorized transactions, including for his own personal use and purchases. For

example, among other things, the purchase of a private jet aircraft (at the price of $4.1

million), manufactured in the U.S., various futures and options investments, as well as

making substantial donations to the Liberal Democratic Party in the U.K. (up to $4

million), the purpose of which is entirely obscure even today.

     26.    BROWN, assisted by HSBC, appears to have wrongfully converted the

funds of the JUDGMENT CREDITORS, while at the same time he continued to send

trading wires and bank account statements from HSBC to the JUDGMENT

CREDITORS. BROWN, through wire transfers from HSBC, also provided for over six

(6) months profits, deliberately deceiving the JUDGMENT CREDITORS as if the trade

activities were successfully developing and keeping them unaware of his fraudulent

activities for that period of time. Partial admission of minor misconduct appears to have

been used to cover up for the misappropriation and concealment of real substantial profits obtained using the JUDGMENT CREDITORS' funds.

27.     On or about October 18, 2005, BROWN was unexpectedly detained in London, upon his suspicious (possibly contrived) conflict with HSBC, with whom he had been associated with regard to the FIFTH AVENUE accounts. BROWN was then temporarily released, surrendered his passport to HSBC, but then left the U.K. on false pretenses (somehow fraudulently obtaining a substitute passport) for returning to Spain where he mostly resided.

28.     In or about April of 2006, BROWN was apprehended, now being in Spain, yet again, and extradited to London, the U.K. BROWN then pled guilty to two counts of fraud, i.e. false pretenses involving the obtaining of the new passport and false statements in an affidavit, particularly concerning trades at Refco Securities LLC in New York, as alleged more in detail below. For those confessed crimes BROWN was sentenced to two years of imprisonment in the U.K. Limited confessions and a plea bargain may have been used as a convenient solution to avoid discovery of greater schemes and concealment by BROWN and HSBC of the JUDGMENT CREDITORS' proceeds.

29.     On information and belief, on or about May of 2007, when his conditional release on the above counts was due, BROWN was further charged by British law enforcement with additional multiple counts of fraud and remains in custody or on bail.

30.     Certain of BROWN's close associates in the U.K. have also, on information and belief, been detained or arrested by British authorities on various charges associated with management and operation of FIFTH AVENUE. These included approximately four operators at Pritchard Stockbrokers Ltd. ("PRITCHARD"), an

England and Wales company, with offices at: Roddis House, Old Christchurch Road,

Bournemouth, BH1 1LG, U.K., regulated by the Financial Services Authority in London.

BROWN had an ownership interest in PRITCHARD and exercised, through a parent

entity, KSC Broking Ltd., an England and Wales company, control over PRITCHARD's

decision-making process.  On information and belief, BROWN used PRITCHARD's

accounts and status of a licensed stock broker for commingling and diverting proceeds

and for fraudulent transfers between the pools of assets.

## V.     FOREIGN JUDGMENT

31.     By October 23, 2006, when the Judgment was entered in the above

referenced matter in the High Court of Justice, the Commercial Court, Queen's Bench

Division, 2005 Folio 841, the Honorable Justice Cooke found that the JUDGMENT

DEBTORS had "no real prospect of successfully defending" the JUDGMENT

CREDITORS' cross-claims.  See page 2 of Exhibit "A".

32.     It was Ordered that Judgment be entered for SO and LU in the amount of

$26,864144.00 and for MANN in the amount of $4,179,226.00 to be paid by BROWN

and FIFTH AVENUE.  Additionally, it was Ordered that judgment be entered for SO and

LU in the amount of €4 million to be paid by FIFTH GMBH.  See pages 2-3 of Exhibit

"A".

33.     BROWN and FIFTH AVENUE were also ordered to pay interest to SO,

LU and MANN, which is to be compounded monthly continuing until the Judgment is

paid. See page 2 of Exhibit "A".

34.     The other JUDGMENT DEBTORS related to BROWN were Ordered to pay MANN $472,925.00, individually, and an additional $4,100,000.00 to the JUDGMENT CREDITORS as a whole. See page 2 of Exhibit "A".

35.     Furthermore, the JUDGMENT CREDITORS were entitled to trace in equity a Raytheon Aircraft Premier 1, manufactured in the U.S. (2002 production), which was purchased from its U.S. manufacturer with their funds ($4.1 million) by DEVONSHIRE. See page 4 of Exhibit "A".

36.     This private jet aircraft has been temporarily placed into the hands of Receivers in the U.K., pending its public sale to bidders worldwide.

37.     To date, the JUDGMENT CREDITORS, however, have not been able to collect all of the judgment debt pursuant to the Order, referred to in Exhibit "A", and the substantial judgment debt remains unsatisfied.

38.     The prospective of collection of the judgment debt in the U.K. has been mostly exhausted by this time.  The basis for the U.K. jurisdiction as to the JUDGMENT CREDITORS has been eliminated and is non-existent, and the JUDGMENT CREDITORS now duly seek the remedies in the U.S. jurisdiction for collection purposes on the Judgment debt.

39.     The JUDGMENT DEBTORS were given adequate notice and adequate opportunity to be heard in the foreign litigation.  The JUDGMENT CREDITORS agreed to the jurisdiction of the Commercial Court only as to the adjudication of their claims against BROWN and his companies, without general appearance.  Even though the action is on the judgment debt, regardless of who currently holds the fraudulently transferred assets, the JUDGMENT DEBTORS are being served process from this Court, out of

extra precaution and as courtesy, in conformity with the requirements of the Hague

Convention on Service Abroad of Judicial and Non-Judicial Documents in Civil and

Commercial Matters.

**VI.    UNDERLYING FACTS ON ACCRUAL OF JUDGMENT DEBT**

40.    Between December, 2004 and April, 2005, the JUDGMENT

CREDITORS and other investors, independently invested a total of approximately $50

million in the accounts of FIFTH AVENUE, at HSBC, as mentioned above, a major

banking group having offices in over 70 countries, including its substantial presence in

the USA.

41.    The sole purpose of that investment was to purchase and resell high-credit

rated fixed income instruments on the MTNs/bonds market.  It was the intent of each of

the investors and the promise of the JUDGEMENT DEBTORS and HSBC to keep each

investor's funds segregated within the FIFTH AVENUE accounts at HSBC.

42.    The submission of those funds by the JUDGMENT CREDITORS was

conditioned, as mentioned above, in the most categorical terms as a strict and irrevocable

condition for placement of funds, that the said funds could not be wire transferred out of

those FIFTH AVENUE accounts at HSBC.

43.    The FIFTH AVENUE investment accounts were controlled by, and at

HSBC, and with HSBC, by BROWN, the medium-term bond trader, who, despite an

outstanding felony arrest warrant against him for deceit in a check-writing incident in

Florida, was highly recommended to the JUDGMENT CREDITORS by HSBC.

44.    The FIFTH AVENUE investment accounts were maintained by HSBC in

London, in an *ad hoc* conspiracy with HSBC.   BROWN and HSBC were to act within

the parameters, and based on the terms, of the irrevocable investment instructions, namely, the trading in bonds with a credit rating of A+ or better, which irrevocable instructions BROWN gave to his bankers and HSBC accepted.

45.    As it was discovered by October, 2005, virtually all of the funds placed by the JUDGMENT CREDITORS into the FIFTH AVENUE accounts at HSBC had been actually removed. Those funds were used contrary to the terms of the irrevocable instructions, issued by BROWN, accepted and stamped by HSBC, for the funds' placement by the JUDGMENT CREDITORS. BROWN by, through, and with knowledge of HSBC intentionally made the destination of the removed proceeds belonging to the JUDGMENT CREDITORS, involving multiple fraudulent transfers, obscure for tracing.

46.    BROWN maintained many bank accounts worldwide, in particular in the multiple names associated with the trade name of FIFTH AVENUE, including but not limited to names of DEVONSHIRE, LAMBERHURST, IDB Foundation, Fifth Avenue Partners S.A. and/or 5th Avenue Partners S.A.(Spain), Fifth Avenue Partners, LTD., U.K. and/or 5th Avenue Partners, LTD, U.K., Fifth Avenue Partners, LTD. (England, Wales) and/or 5th Avenue Partners, LTD. (England, Wales), Fifth Avenue Partners LTD. (BVI-IBC 502359) and/or 5th Avenue Partners, LTD. (BVI- IBC 502359) and using numerous other corporate names, as well as trustees, for the purpose of directing and coordinating the unauthorized movement of funds around the world, communicating with other persons.

47.    Those persons with whom BROWN, recently incarcerated in England, was coordinating his activities included Swiss bankers Juerg Walker and Reto Walker, an

Australian national, Mark Ellis, BROWN's partner and trader at FIFTH AVENUE, and

others. These persons included BROWN's contacts, certain bankers at major financial

institutions whom he used for references at REFCO as counterparty buyers, all using

BLOOMBERG e-mail addresses, acting in concert with BROWN. See Exhibit "B".

48.    Furthermore, BROWN established business contacts for trading

transactions with U.S.-based counterparts: Chris Modica, of Cantor Fitzgerald LLC

("CANTOR FITZGERALD"), Craig Christensen, of Christensen Law Group, Jeffrey M.

Moritz, of Univest Financial Group Inc. ("UNIVEST"), and others.

49.    Upon information and belief, the proceeds placed by the JUDGMENT

CREDITORS were used in the course of BROWN's bonds trading in New York, and

discovery of evidence of the bonds' trades is necessary to locate those proceeds.

50.    In particular, BROWN directed $10 million of commingled funds to New

York in February of 2005, which is addressed more specifically below. See also Exhibit

"C". For determination of the proceeds and their current location the various categories

of evidence obtainable in New York will aid enforcement of the Judgment.

51.    The certain financial institutions, where BROWN's trades were either

serviced or documented, hold discoverable bonds' trading information, including profits,

the disclosure of which is already mandated in consolidated financial statements required

from NYSE-traded companies. Such evidence on the documentary information available

in New York includes, *inter alia*, the following examples:

>    i    From March to September, 2005, the JUDGMENT CREDITORS
>    received profits were wire transferred from London based upon the
>    investments made in the FIFTH AVENUE accounts. Accompanying every
>    wire transaction, a trade ticket generated by BROWN through his
>    BLOOMBERG account was made and sent to each JUDGMENT
>    CREDITOR, or his/her representatives. The trade tickets were allegedly also

sent through the BLOOMBERG system. See Exhibits "D" and "E" with the alleged trade tickets incorporated herewith by reference.

ii. Two additional trades (labeled "the PRITCHARD's trades") were allegedly made by BROWN from his account at La Caixa Bank, Mallorca, Spain, for which the JUDGMENT CREDITORS' money was used by BROWN (and improperly transferred) from HSBC account to pay off the "Pritchard" investor, who was owed principle and profits from these trades at Pritchard Securities Ltd. (U.K.). This enabled BROWN to keep all of the profits and principle used to purchase these two bonds in his account at La Caixa Bank. The CUSIP and/or ISIN numbers of the bonds, the subject of the "Pritchard's trades," are set out in the BLOOMBERG message trade tickets of BROWN. See Exhibits "D" and "E". In addition, BROWN made a trade for UNIVEST, ISIN XSO184468550 in January of 2005, which may have involved commingling of the assets involved in trades.

("ISIN" stands for International Securities Identification Number)

## VII.    UNAUTHORIZED TRANSFER TO THE U.S. OF FUNDS

52.    On or about February 8, 2005, BROWN entered on behalf of FIFTH AVENUE into (an) agreements with a licensed stock broker institution called Refco Securities LLC (hereinafter "REFCO"), a Delaware Limited Liability Company, engaging in business in the State of New York, with a primary office at 200 Liberty Street, Tower A, 23rd Floor, New York, NY.

53.    THOSE agreements among others, included a clearing and services agreement as well as a "Global Master Repurchasing Agreement", under which REFCO was the principal in New York for various trades undertaken by BROWN. The agreements were signed on behalf of FIFTH AVENUE by BROWN and on behalf of REFCO by Stephen Hawksworth, who became along with David Mudie and possibly others, BROWN's account executive at REFCO.

54.    Under that agreement, REFCO provided BROWN in New York with a substantial margin to acquire, on a highly leveraged basis, the MTNs/bonds, as well as to

service all the corresponding trade transactions.  REFCO was to be paid fees by FIFTH

AVENUE, ultimately from JUDGMENT CREDITORS's funds, on every trade and for

maintaining the investment account.

55.    More specifically, according to that agreement, REFCO undertook by

contract with BROWN and his companies to open up accounts for BROWN and his

companies, whereby REFCO was to act as a principal on their behalf, in the purchasing

of A+ rated fixed income securities, and to sell such bonds to other bank counterparts,

referred by BROWN through his agents to REFCO.

56.    REFCO gave BROWN, *inter alia*, access to Inter-dealer screens, as well

as internal clearing accounting.  REFCO on its part required BROWN's counterparties to

execute a "Notice of Counterparty Status" letter to establish and define a formal

relationship with REFCO, recognizing REFCO's role in the transactions.

57.    Certain alleged trading tickets generated by BROWN have the specific

notations "through REFCO 99099".  See Exhibits "D" and "E".  BROWN was also to

receive regular statements from REFCO, some of which were subsequently found as

being inconsistent with other records.

58.    BROWN immediately moved a substantial portion of his operation into

New York.  In one representative instance, as recorded in Bloomberg messaging,

BROWN stated on February 13, 2005 to a third party: *"I have... moved everything to

REFCO"*.  Attached hereto as Exhibit "F".

59.    Additionally, on February 17, 2005, REFCO entered into a three-party

agreement with FIFTH AVENUE and CANTOR FITZGERALD ("CANTOR

FITZGERALD") in New York, by virtue of which both REFCO and CANTOR

FITZGERALD could serve as principals for FIFTH AVENUE's trades in New York, which previewed that those trades were to be regulated under the laws of the State of New York.

60.    On about February 17, 2005, BROWN instructed HSBC, contrary to the terms of the Irrevocable Letter of Instruction approved by HSBC, to wire transfer $10 million from his FIFTH AVENUE account at HSBC in London to REFCO in New York. See Exhibit "B". For reasons at this time, HSBC wire transferred those proceeds in two transactions, i.e. of $9,990,000 and $10,000 on the same day. The monies were transferred to Chase Bank in New York, at ABA routing No. 021000021.

61.    These wire transfers were, specifically, in violation of the Irrevocable Letter of Instruction issued by BROWN and approved by HSBC, and without any apparent inter-bank arrangement between BROWN's bank in London, HSBC, and REFCO, about the preservation and segregation of the commingled funds as set out in the irrevocable instructions.

62.    According to the BLOOMBERG records, reflected in BROWN's communications using the BLOOMBERG messaging system, BROWN allegedly engaged in certain trading activities in New York, including but not limited to ISIN: US78010FBK57, ISIN: US06738C8284, ISIN: XS0149161217, ISIN: XS016695700. See Exhibit "E".

63.    The alleged settlement dates for those trades in New York were on April 19, May 25, and June 17, in 2005. The alleged principal amounts for the trading of the notes were, respectively, about $70,725,000 (issuer Royal Bank of Scotland),

approximately $94.3 million (issuer Barclays Bank), and approximately $95.8 million (issuer Royal Bank of Scotland Capital Trust).

64.     There is a controversy whether those trades actually took place at all or rather those records were fraudulently created to cover up for misappropriation of funds. To this date the JUDGMENT CREDITORS have had no opportunity to do any discovery nor has any discovery been done to determine the existence of these or any other trades.

65.     Brown had no authorization by the beneficial owners for the transfers of their funds to New York or anywhere from the accounts of FIFTH AVENUE at HSBC, as previewed in the irrevocable written instructions, acknowledged and stamped by HSBC. Furthermore, the JUDGMENT CREDITORS are not aware of any inter-bank agreement with REFCO and HSBC about the segregation of the assets, and of any other protections set out in the irrevocable letters of instructions, issued by BROWN and approved by HSBC.

66.     By October of 2005, a part of the initial investment at REFCO of $10 million was wire transferred from New York to London and allegedly also to La Caixa bank in Spain, and became commingled among various other proceeds fraudulently wire transferred from the FIFTH AVENUE account and controlled by BROWN.

67.     A certain other part of the $10 million of the commingled funds, the exact amount still be determined, has never been transferred from New York back to London or to Spain or otherwise recovered for or by the JUDGMENT CREDITORS.

68.     On information and belief, a part of that amount has been fraudulently transferred to accounts other than the account of REFCO and is currently located in New York or is controlled out of New York, involving fraudulent transfers.

## VIII.  NECESSARY DISCOVERY IN AID OF JUDGMENT ENFORCEMENT

69.     The JUDGMENT CREDITORS must take it upon themselves to discover

the trading history of all of the BROWN-related bond trades by obtaining the records of

all trades by each specific bond's CUSIP and ISIN number, in order to determine the

validity and accuracy of the trades in question, as well as the subsequent fraudulent

transfers of the generated funds.  In addition, the JUDGMENT CREDITORS must use

discovery to determine all trades and trading history of such bonds, as well as all REFCO

and CANTOR FITZGERALD trades with BROWN's counterparty banks to determine if

any trades were similar.  In addition, all documentation of persons working with brown

and HSBC must be discovered

70.     To illustrate the importance of the discovery in every detail (which may

translate into millions of U.S. dollars, if discovered), BROWN may well have altered or

used third parties through REFCO to hide the real trading profits, as well as larger

spreads than those he disclosed to the JUDGMENT CREDITORS.  Finally, the

JUDGMENT CREDITORS need to obtain discovery of all the relevant "term sheets" of

the initial offerings of HSBC bond and structured notes at REFCO and CANTOR

FITZGERALD, as well as the term sheets of all the bonds BROWN has indicated he

traded on his Bloomberg message tickets sent to the investors.  Additionally, all

Pritchard's and Univest trades must be discovered.

71.     The JUDGMENT CREDITORS need to determine the underwriters'

discount offered to REFCO and CANTOR FITZGERALD by HSBC, to determine if

BROWN was even able to cause REFCO and/or CANTOR FITZGERALD or others  to

purchase new HSBC or other bonds' issued and resell them for additional profit at his indicated spread, due to the underwriters' discount spread.

72.      In summation, in order to be able to collect on the judgment debt, it is critical for the JUDGMENT CREDITORS to discover in New York:

a.      information relating to the trading of BROWN's bankers and counterparts, namely the trading (buy and sell) activity of the MTNs/bonds, with a credit rating of A+ or better, occurring between December 2004 and October 2005. Such information is located and maintained in the REFCO and CANTOR FITZGERALD trading books, the primary issuance books and the clearing records held at BLOOMBERG, the DEPOSITORY TRUST COMPANY ("DTC") and at EUROCLEAR BANK. In addition, the JUDGMENT CREDITORS are entitled to discover the trading and clearing records that are maintained at each bank in New York that serviced the respective trade transactions;

b.      the trading of BROWN both for the JUDGMENT CREDITORS, as well as through PRITCHARD, associated and/or commingled with the FIFTH AVENUE trades.

73.      When MANN previously requested that BLOOMBERG voluntarily produce records and communications on the accounts maintained by BROWN, BLOOMBERG, through counsel, indicated that BLOOMBERG wished fully to cooperate, in order to prevent the past, present and future fraudulent misuse of BLOOMBERG accounts and e-mail systems, and that BLOOMBERG could and would voluntarily produce the requested information subject to a valid Court order.

74.    BLOOMBERG, an entity from whom some of the requested discovery is sought, has offices in New York at 731 Lexington Avenue, 499 Park Avenue, and, therefore, "resides or is found" within the jurisdictional boundaries of the Southern District of New York.

75.    EUROCLEAR, an entity from whom some of the requested discovery is sought, has offices in New York at 1 Battery Park Plaza, New York, NY 10004, and, therefore, "resides or is found" within the jurisdictional boundaries of the Southern District of New York.

76.    DTC, an entity from whom some of the requested discovery is sought, has offices in New York at 220 W 30th St, New York, NY 10001, and, therefore, "resides or is found" within the jurisdictional boundaries of the Southern District of New York.

77.    CANTOR FITZGERALD, an entity from whom some of the requested discovery is sought, has offices in New York at 110 East 59th Street, New York, New York 10022, and, therefore, "resides or is found" within the jurisdictional boundaries of the Southern District of New York.

78.    HSBC USA N.A , an entity from whom some of the requested discovery is sought, has offices throughout New York, including its various locations in Manhattan, and, therefore, "resides or is found" within the jurisdictional boundaries of the Southern District of New York.  Additionally, disclosure by REFCO is expected to shed light on the involvement of HSBC bankers in the events at issue. HSBC Bank PLC , London also has stated it has Bloomberg records of its bond trades, including new issues and HSBC Interbank trades

79.    The relevant affiliates of HSBC and the entities from whom some of the requested discovery is sought, have offices, employ personnel and agents, advertise and solicit business in New York electronically and by other means, and are included in the consolidated financial statement s of HSBC group holdings, filed with the United States Securities and Exchange Commission, for purposes of selling HSBC stock in every brokerage house in New York and throughout the United States (NYSE symbol: HBC) and, therefore, those "reside or are found" within the jurisdictional boundaries of the Southern District of New York.

80.    REFCO, an entity from whom some of the requested discovery is sought, has offices throughout New York, including various locations in Manhattan, i.e. its primary office at 200 Liberty Street, Tower A, 23rd Floor, New York, NY, and, therefore, REFCO "resides or is found" within the jurisdictional boundaries of the Southern District of New York.  On information and belief, REFCO has been in the process of restructuring, and discovery may apply to its successor(s).

81.    As BLOOMBERG messaging and other evidence show, in the course of his trades in New York, BROWN was in contact with various financial officers, representing the certain financial institutions in New York.  Those individuals residing or working in New York are also important witnesses who are expected to provide information on the movement of funds on the instructions of BROWN on, and through, the accounts in New York. As set out in many Exhibits, BROWN counterparty contacts have Bloomberg email addresses, the discovery of which may well lead to evidence of BROWN's fraudulent scheme.

WHEREFORE, JUDGMENT CREDITORS MANN, LOTUSBAY and LIAN, respectfully request this Honorable Court, in conjunction with the post-judgment discovery in aid of the Judgment enforcement from the assets believed to be located in, or controlled out of, New York, the United States, to grant such Orders that may facilitate the said Judgment enforcement, including, but not limited to, protective orders, injunctive relief, attachments, creating a receivership, as well as any such other relief that the Court may grant for purposes of collection of the Judgment debt.

DATED:  June 4, 2007

Respectfully submitted,

RAWLE & HENDERSON LLP

By: s/ Joshua Bachrach

Joshua Bachrach, Esquire,
Counsel for Judgment Creditors
Suite 4636, 46th Floor
140 Broadway, New York, NY 10005
212.858.7570 (PHONE)
212.858.7750 (FAX)